**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

GREGORY GARMON, SR.
      Plaintiff,

      v.                          C.A. No. 13-516-ML

AMTRAK,
      Defendant.

**MEMORANDUM AND ORDER**

Gregory Garmon, Sr. ("Garmon"), the plaintiff in this employment discrimination case brought under 42 U.S.C. § 1981, has alleged that he was subjected to harassment and discrimination on account of his race in the course of his 18-year employment by the defendant, the National Railroad Passenger Corporation ("Amtrak"). The gravamen of Garmon's claims appears to be that in 2012 and 2013, Garmon, who is African-American, received fewer opportunities for overtime hours than some of his Caucasian colleagues. Garmon seeks compensatory damages, punitive damages, and attorney fees and costs. Amended Complaint (Dkt. No. 14). The matter before the Court is Amtrak's motion for summary judgment[1] on the sole remaining

---

[1]
    Amtrak has requested oral argument on his motion. In light of the parties' extensive memoranda, affidavits, and exhibits, the Court is of the opinion that oral argument is not necessary in this case and will proceed to decide the motion on the submitted pleadings and supporting documentation. See Fed.R.Civ.P. 78(b); Cia. Petrolera Caribe, Inc. v. Arco Carribean, Inc., 754 F.2d 404, 411 (1st Cir.1985)(district court has "wide latitude" in deciding whether oral argument is necessary before determining summary judgment).

claim[2] of Garmon's Amended Complaint.

## I. Factual Background[3]

Garmon was hired by Amtrak in 1997 as a signal helper. He is currently employed by Amtrak as an Electric Traction Lineman, a position to which he was promoted in 2001 and which includes a variety of duties. DSUF 1-3. Between 2003 and February 2015, the first shift for the Amtrak Electric Traction Department in Providence included Garmon, Christopher Alves ("Alves"), and William Butler ("Butler"). Alves and Butler are both qualified as linemen and as High Rail Operators ("HROs"). HROs operate high rail equipment and also perform lineman duties. DSUF 5. According to Garmon, he "simply had not desired to be an HRO" and never qualified for that position. PSUF 10.

In February 2015, Amtrak made operational changes which included splitting the first shift (which ran from 6:00 a.m. to

---

2

Garmon's claims for negligent and intentional infliction of emotional distress, brought under the Federal Employers' Liability Act, 45 U.S.C. §51 *et seq.*, were dismissed on January 15, 2014, when this Court adopted Magistrate Judge Almond's Report and Recommendation (Dkt. No. 20), to which no objections were filed.

3

The summary of facts is based on Amtrak's Statement of Undisputed Material Facts ("DSUF")(Dkt. No. 33) and Garmon's responses thereto ("PSUF")(Dkt. No. 39), as well as the related exhibits both parties submitted in support of their respective positions.

2:00 p.m. Monday through Friday) into two shifts.[4] Garmon is assigned to the first shift running 6:00 a.m. to 4:30 p.m. Wednesday through Saturday; the other first shift runs at the same times, Sunday through Wednesday. DSUF 6. The first-shift foreman is Thackaberry, who posted for and received that position in 2008. DSUF 8. Since July 30, 2005, Garmon has been supervised by day shift supervisor Gregory Brennan ("Brennan") who is qualified as a lineman, HRO, foreman, and supervisor. DSUF 9.

Amtrak is unionized and operates under a collective bargaining agreement ("CBA") negotiated by the International Brotherhood of Electrical Workers ("IBEW"). The applicable CBA in this case is the agreement between Amtrak and IBEW System Council No. 7, effective September 1, 1975, last modified October 20, 2010. DSUF 13. Although Garmon maintains that the CBA does not govern overtime and that overtime plans are promulgated by Amtrak, it is undisputed that the CBA includes provisions addressing the manning of overtime plans (as well as matters of grievances and discipline). Id., PSUF 13. Pursuant to Rule 13 of the CBA, "[o]vertime [is] to be distributed in conjunction with the duly authorized local committee of the craft or of their representative and the local management. Record will be kept of overtime worked and men called with the

_____

[4]
In effect, Amtrak was consolidating three 8-hour shifts into two 10.5-hour shifts. DSUF 28. Amtrak cites budgetary reasons; Garmon suggests that the change was effected to separate him from Alves, Butler, and James Thackaberry ("Thackaberry"). PSUF 28.

purpose in view [sic] of distributing the overtime equally." DSUF 21.

Under the CBA, all claims and grievances other than those involving discipline must be timely presented to the IBEW in writing. DSUF 15. It is undisputed that Garmon, who is a member of the IBEW and whose employment is governed by the CBA, has never filed any claim or grievance with the IBEW and that the IBEW has not received any overtime-related grievances from Garmon. DSUF 16-18. On his part, Garmon suggests that the CBA provision regarding grievances is not applicable to race-based discrimination claims. PSUF 15. Garmon acknowledges that Amtrak maintains an Anti-Discrimination and Anti-Harassment Policy and an Equal Employment Opportunity/Affirmative Action Policy and that Amtrak has a Dispute Resolution Office to resolve complaints of discrimination and enforce Amtrak's policies. DSUF 20. Garmon suggests, however, that Amtrak does not enforce these policies or abide by them. PSUF 20.

Garmon concedes that he has never been disciplined by an Amtrak manager or supervisor. He maintains, however, that his loss of income under a new overtime distribution process which, Garmon alleges, was implemented by Brennan in Fall 2012, constitutes an adverse employment action against him. PSUF 4, 29. It is noted that Garmon's assertion that Amtrak instituted a new overtime policy in Fall 2012, on which his claim rests, is entirely unsupported by any factual evidence. On its part, Amtrak asserts that the process of

4

how overtime is distributed did not change in 2012. DSUF 29, 31, 37.

Since February 24, 2011, Assistant Division Engineer Michael Poole ("Poole") has been in charge of determining the amount of overtime needed for Garmon's department, taking a number of factors into consideration, and then seeking budgetary approval from Amtrak's senior management. DSUF 22. Weekend overtime is staffed by members of the Boston/Providence cost center to cover both cities and to service the connecting track. DSUF 23. According to Garmon's allegations, Poole follows Brennan's suggestion as to who should participate in overtime. PSUF 22.

Generally, Garmon denies that overtime is structured pursuant to the CBA, insisting that Amtrak, not IBEW, "promulgates" the overtime plans, and that IBEW merely addresses manning of the positions as set forth in the overtime plan. PSUF 21, 23, 24. According to Garmon, beginning in Fall 2012, IBEW allowed HROs to fill slots available for HROs. PSUF 29. In addition, employees with foreman qualifications can apply for overtime slots designated for foremen. PSUF 24. As a result, a foreman can now work overtime, whereas before the alleged change, a foreman could not have filled that overtime slot unless Garmon, or Alves and Poulter[5] had first rejected it. Id. Garmon asserts that Amtrak engages in

---

[5] It is unclear whether Garmon meant to refer to Butler here.

discrimination against Garmon (the sole lineman) by making overtime slots available to HROs and foremen, and keeping linemen out of the positions (or, more accurately, giving lower priority to linemen for selecting certain slots). PSUF 26.

Amtrak employees are given an opportunity to select overtime based on their respective shifts, positions, and locations. First-shift employees are given preference for first shift overtime, provided they are qualified for the position posted, *e.g.,* a first-shift HRO can select an HRO slot, a lineman cannot do so unless no HRO has selected the slot first. DSUF 29, PSUF 32. According to Garmon,[6] beginning in Fall 2012, Brennan began assigning overtime by position (as well as shift), which deprived Garmon of overtime opportunities (because he was a lineman and could only qualify for overtime slots designated for linemen or for HRO/foreman designated slots not first selected by HROs and/or foremen). PSUF 29. Garmon asserts that, prior to Fall 2012, he "shared overtime opportunities equally." PSUF 31.

It is undisputed that Garmon can fill overtime slots for positions <u>other</u> than first-shift lineman only if no qualified

---

[6]
Garmon's response to the Defendants' Statement of Undisputed Facts is not a model of clarity in that, at least in part, it does not specifically dispute the Defendant's version of events, but provides Garmon's own interpretation of those events. In addition, Garmon's response adds extraneous information, including unsupported allegations of unrelated misconduct against some of his co-workers.

individual holding that position has filled it, making it available to Garmon. DSUF 31. In addition, Garmon has priority to obtain an overtime slot one weekend shift each month in Providence and, if no Boston lineman or an HRO fills the slot, an additional weekend shift in Boston. PSUF 31. If no lineman, HRO, or foreman selects an overtime shift, a Supervisor or Assistant Supervisor (who are qualified for all positions) may elect the shift to ensure sufficient coverage. DSUF 34.

The undisputed facts reveal that, between 2009 and 2013, Garmon worked 2,720 overtime hours. During that same time period, Butler (who is an HRO and Caucasian) worked 1,456 overtime hours; Alves (who is an HRO and Caucasian) worked 4,166 hours; and Thackaberry (who is a foreman and Caucasian) worked 2,228 hours. DSUF 38. Between January 1, 2013 and July 31, 2013 (following the alleged change in overtime distribution until shortly after Garmon filed his complaint) Garmon worked 269 overtime hours. During that same time period, Butler worked 141 overtime hours; Alves worked 646 hours; and Thackaberry worked 272 hours. Def.'s Mot. 8 (Dkt. No. 32). In 2012, which includes the period before and after the alleged change in overtime distribution, Garmon also worked more overtime hours (491) than both Thackaberry (294) and Butler (256). In other words, Garmon worked as much or more overtime than two of his three first-shift Caucasian colleagues before and after the alleged change, notwithstanding the fact that both of his

colleagues had qualifications that would give them priority over Garmon with respect to HRO and/or foremen slots. DSUF 38.

Garmon concedes that he did not accept certain shifts that were available to him and, particularly, that "he did not accept slots on many Sundays because he needs to attend church." PSUF 39. In other words, Garmon complains that he was given "fewer opportunities to accept or reject slots," as a result of which he worked fewer overtime hours. Id.

According to Garmon, until the distribution of overtime was changed in Fall 2012, overtime was distributed fairly (in that it made more slots available to him). Because the overtime distribution gave priority to HROs from all shifts for HRO slots and included foremen into the rotation, Garmon's opportunities for overtime (should he decide to apply for a slot) were reduced. PSUF 44-46. As a result of the alleged change in the overtime distribution scheme, Garmon lost the opportunity of choosing a first-shift HRO overtime slot if Andy Bendigo ("Bendigo"), a third-shift HRO (who is African-American and was promoted from lineman to HRO in March 2012) selected that option. DSUF, PSUF 48, 49. Although Garmon points out that Bendigo could only select that slot after Alves and Butler (both Caucasian) declined it, that limitation is consistent with the scheme of giving priority for selecting a first-shift HRO slot to first-shift HROs before offering it to a third-shift HRO (after which a lineman like Garmon

could apply for that slot). PSUF 48.

Regarding overtime hours worked by Brennan, Garmon's supervisor, Garmon concedes that most of those hours were designated specifically for supervisors pursuant to the CBA between Amtrak and ARASA [American Railway and Airway Supervisors Association] and consisted of overtime opportunities to which Garmon was not entitled. DSUF, PSUF 51.

Eventually, Garmon complained about the overtime designations to Division Engineer George Fitter ("Fitter"), who determined that overtime was being distributed in accordance with the provisions of the IBEW CBA. DSUF 52, 53. (Garmon's denial of this statement is based on the contention that Fitter "could not have conducted any such investigation because the Amtrak plan and not the union created the discriminatory treatment," a statement which is both argumentative and non-responsive. PSUF 53.) At Fitter's suggestion, Garmon spoke with Amtrak EEO [Equal Employment Opportunity] Officer Sten Siebert regarding Brennan, but never followed up with Siebert. DSUF 55. It is undisputed that Garmon never complained to his union about the alleged discriminatory conduct. DSUF 66.

Much of Garmon's race-based harassment claim is based on his interactions with Brennan. Garmon alleges that Brennan would not speak to him between 1998-2008 if Garmon was among a group of

certain electric traction employees, DSUF, PSUF 57.[7] Although Garmon concedes that the lack of communications ended in 2008, he maintains that Brennan's discriminatory practices did not. As an example, Garmon alleges that he was directed by Brennan to work alone in 2012 and 2013. PSUF 57. In addition, Garmon claims that, since 2005, Brennan has prevented him from having keys to certain storage canisters, PSUF 61, and that, in 2005, Brennan refused to allow Garmon to use structural erection diagrams while building cantilevers. DSUF, PSUF 62. With regard to the latter, Garmon concedes that he never asked to use the diagrams. Maintaining that he did not receive as much training as HROs Alves and Butler, Garmon does not dispute that he received training on diagrams with all other original linemen, that he attended a 13-week training class in 1999-2000, and that he received further training on the diagrams from Thackaberry and Pat Rockett. DSUF 62.

As other examples of alleged discriminatory conduct at his work place, Garmon notes that all Caucasian workers separated from him when he complained about overtime and that former Assistant Engineer Jim Candlish failed to specifically praise Garmon during monthly safety meetings. Although Garmon could not identify any Caucasian individuals who were praised during the meetings, he maintains that he remembers Caucasian employees receiving positive

---

[7]

    Similarly, Garmon complained that his colleague Butler would not speak to him between 1998-1999. DSUF, PSUF 56.

comments. PSUF 57, 58.

Further allegations made by Garmon include that Brennan allowed Alves to go home and retrieve his wife's car (an opportunity that Garmon never requested); that Brennan opposed Barack Obama's bid for the presidency (it is unstated and unknown on what grounds); and that Thackberry gave Garmon an assignment that Garmon believed was intended to get him "in trouble." PSUF 63, 64, 65. Garmon also claims that since September 2013, there have been two traffic-related incidents with two colleagues from other departments, which Garmon, without offering further factual support, attributes to his having commenced this lawsuit. PSUF 59, 60.

## II. Procedural History

On July 11, 2013, Garmon filed a three-count complaint against Amtrak, alleging race-based discrimination and intentional and negligent infliction of emotional distress. (Dkt. No. 1). Garmon filed an Amended Complaint on October 22, 2014, alleging the same claims (Dkt. No. 14). Following a hearing on the Defendants' motion to dismiss both emotional distress claims (Dkt. No. 15), Magistrate Judge Almond issued a Report and Recommendation ("R&R"), in which he recommended that those claims be dismissed (Dkt. No. 20). No objection was filed to the R&R, and this Court, after conducting an independent review of the Amended Complaint and the R&R, adopted the R&R in its entirety on January 15, 2014 (Dkt. No. 21).

On March 3, 2015, Amtrak filed a motion for summary judgment on Garmon's remaining claim (Dkt. No. 31), to which Garmon objected on April 20, 2015 (Dkt. No. 40). Amtrak filed a reply to Garmon's objection on May 11, 2015 (Dkt. No. 42).

## III. Standard of Review

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the Court reviews the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir.1997).

In summary judgment, the burden shifts from the moving party, who must first aver "'an absence of evidence to support the nonmoving party's case,'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)), to the nonmoving party, who must present facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.1995); Maldonado-Denis v. Castillo-Rodriquez, 23 F.3d 576, 581 (1st Cir.1994)).

In the context of an employment discrimination claim, "a plaintiff's ability to survive summary judgment depends on his

ability to muster facts sufficient to support an inference of discrimination." <u>Bennett v. Saint-Gobain Corp.</u>, 507 F.3d 23, 30 (1st Cir. 2007). Accordingly, a plaintiff "cannot rely exclusively on bald assertions, unsupported conclusions, or optimistic surmises." <u>Id.</u> (citing <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir.1990)). Garmon, as the plaintiff, has the burden of proof in this case; therefore, the "evidence adduced on each of the elements of his asserted cause of action must be significantly probative in order to forestall summary judgment." <u>Bennett v. Saint-Gobain Corp.</u>, 507 F.3d at 30 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## IV. Discussion

### A. Adverse Employment Actions

Title VII mandates that "[a]ll personnel actions" affecting federal employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). <u>Morales-Vallellanes v. Potter</u>, 605 F.3d 27, 35 (1st Cir. 2010). Under the burden-shifting framework set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and explained in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the litigation follows three stages in which Garmon has to show that (1) he was within a protected class; (2) he met the

employer's legitimate performance expectations; (3) he was adversely affected; and (4) there was some evidence of a causal connection between his membership in a protected class and the adverse employment action. Bhatti v. Trustee of Boston University, 659 F.3d 64, 70 (1st Cir. 2011); Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir.1999). Only after Garmon makes such a *prima facie* showing, does the burden shift to Amtrak to articulate a legitimate nondiscriminatory reason for the employment action. Id. Once Amtrak has made such a showing, the burden shifts back to Garmon to prove that Amtrak's articulated reason is merely pretext for discrimination. Id.

To succeed on his race-based disparate treatment claim, Garmon must establish that Amtrak either (1) took something of consequence away from him, *e.g.* by discharging or demoting him, reducing his salary, or divesting him of significant responsibilities, or (2) withheld from him "an accouterment of the employment relationship." Blackie v. Maine, 75 F.3d 716, 725 (1st Cir.1996) (citing Hishon v. King & Spalding, 467 U.S. 69, 75–76, 104 S.Ct. 2229, 2233–34, 81 L.Ed.2d 59 (1984)). In other words, Garmon must first show that he suffered an "adverse employment action" on account of a protected ground. García v. Bristol–Myers Squibb Co., 535 F.3d 23, 31 (1st Cir.2008).

The determination of whether an employment action is "materially adverse" is based on an objective standard. Morales-

14

Vallellanes v. Potter, 605 F.3d at 35 (citing Blackie v. Maine, 75 F.3d at 725. The Supreme Court has defined "adverse employment action" as one that "affect[s] employment or alter[s] the conditions of the workplace" Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 61-62, 126 S.Ct. 2405 (2006). Typically, it "involves discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Morales-Vallellanes v. Potter, 605 F.3d at 35 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)); see also Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir.2002) ("To be adverse, an action must materially change the conditions of plaintiffs' employ."

The First Circuit has explained that "[a]dverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" White v. New Hampshire Dept. of Corrections, 221 F.3d 254 (1st Ci. 2000) at 262 (quoting Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)). The First Circuit has also recognized that "'[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of

a materially adverse employment action.'" <u>Marrero v. Goya of Puerto</u> <u>Rico, Inc.</u>, 304 F.3d 7, 23 (1st Cir. 2002)(quoting <u>Blackie v.</u> <u>Maine</u>, 75 F.3d at 725).

In this case, Garmon has conceded that the only asserted adverse employment action he has incurred relates to the alleged change in overtime scheduling. Garmon continues to be employed by Amtrak; he is continuing his work as a lineman; he has never been demoted, disciplined or, based on his own assertions, suffered a disadvantageous transfer or a reduction in responsibilities, nor has he received a negative job evaluation. Rather, Garmon's claim is predicated entirely on his contention that, following a change in overtime scheduling, his opportunities for overtime hours decreased.

When examined more closely, and undisputed by Garmon, the schedule did not suddenly exclude Garmon from existing slots for overtime work. Rather, the schedule attempts to ensure that overtime was distributed equitably, in accordance with the CBA. Employees are qualified to apply for certain designated overtime slots based on their respective shifts, their positions/qualifications, and the primary location of their work. As a result, a first-shift lineman in Providence (like Garmon) has priority in selecting a slot designated for the first-shift lineman in Providence on Saturday and Sunday. Garmon's ability to select other overtime slots that carried a different designation (third-

shift, HRO only, or Boston), depends on whether employees who carried those designations declined those slots. In addition, because Garmon is the only lineman in the Boston/Providence cost center, Garmon has priority for first-shift lineman overtime slots in both Boston and Providence. Garmon is not eligible for priority in selecting an HRO designated overtime slot, because he is not an HRO (and, based on his own statement, "simply had not desired to be an HRO." PSUF 10). However, Garmon can select a first-shift, Providence-based, HRO designated slot if no HRO elects to work that overtime shift.

Notwithstanding the alleged change in overtime scheduling, it is undisputed that in 2013[8], like in the four preceding years, Garmon worked as many or more overtime hours than two of his Caucasian colleagues, both of whom had HRO and/or foreman qualifications. Garmon also concedes that he did not avail himself of overtime opportunities offered to him on many Sundays. PSUF 39. (Garmon denies, inexplicably, that his overtime hours would have increased had he elected all the overtime shifts available to him. PSUF 42.)

Essentially, it is not the exclusion from overtime opportunity that Garmon complains of, it is the inclusion of other employees

_____

[8]

The overtime data for 2013 comprises only seven months and, accordingly, shows lower overtime hours for all first-shift employees than for the preceding full years. Def.'s Mem. at 8 (Dkt. No. 32).

who have additional qualifications, like HRO or foreman, who work on a different shift, or who are primarily located in Boston. One of the employees who, by virtue of being promoted to HRO, had priority over Garmon in selecting an HRO overtime slot, was Andy Bendigo ("Bendigo"). Under the overtime designation scheme, Bendigo, who is African-American and worked the third shift, could select a first-shift HRO slot if no other first-shift HRO had selected that slot. Garmon could select that slot only if no other HRO, regardless of shift, had chosen to work that overtime slot. Garmon suggests that Butler and Alves had greater opportunities for overtime than Bendigo because Bendigo "could participate only when those two white workers declined the slots." PSUF 48. However, that appears to be true (and Garmon does not assert otherwise) with respect to first-shift slots only, for which Butler and Alves, as first-shift HROs, had priority because Bendigo was a third-shift HRO.

In sum, there is no evidence to support Garmon's contention that his alleged decrease in opportunities for selecting overtime slots was the result of race-based discrimination or that the overtime distribution plan was changed based on an illegal discrimination criterion, nor does Garmon refute Amtrak's proffered reason that the overtime distribution scheme is intended to ensure that overtime is distributed equitably.

Garmon had fewer opportunities to work overtime because he

was not an HRO (by his own choice), because he worked first shift, and because he was located primarily in Providence. Accordingly, employees with HRO or foreman qualifications, or those located primarily in Boston, had priorities to select overtime slots that fit their designations. Nevertheless, Garmon accumulated as many or more overtime hours than two of his three first-shift colleagues who were both Caucasian and qualified as HROs and/or foreman. In addition, Garmon had priority in choosing the first-shift lineman designated slot for either Providence or Boston, because he was the only first-shift lineman for the combined cost center. Garmon's complaint about losing priority to third-shift HRO Bendigo can also not serve to support his claims of race-based discrimination because Bendigo, like Garmon, is African-American and had priority over Garmon in selecting an HRO slot because he carried that qualification, whereas Garmon did not.

Notably, Garmon does not offer a single example of being denied an overtime slot for which he had priority, either because it was lineman designated or because other eligible employees had declined the slot, thus making it open for Garmon's election. Instead, Garmon concedes that he would have had opportunities for additional overtime on Sundays but that he declined to exercise them. Under those circumstances, the Court is of the opinion that, based on the undisputed facts of the case, Garmon has not met his burden to establish a *prima facie* case because he failed to show

that (1) he suffered an adverse employment action and/or (2) there was a connection between his membership in a protected class and the allegedly adverse employment action.

**B. Hostile Work Environment**

To be successful on a claim of hostile work environment, Garmon must establish harassment "sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment." Douglas v. J.C. Penney Co., 474 F.3d 10, 15 (1st Cir.2007). To establish a *prima facie* case for a hostile work environment claim, Garmon must establish:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome ... racial harassment; (3) that the harassment was based upon ... race; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of [his] employment and create an abusive work environment; (5) that ... racially objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [he] did perceive it to be so; and (6) that some basis for employer liability has been established. Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 15 (1st Cir.2007).

Race-based employment discrimination claims under § 1981 are subject to a four year statute of limitations. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004). Garmon filed his complaint on July 11, 2013; therefore, his § 1981 claims are limited to employment actions occurring after July 11, 2009. Garmon's unsubstantiated allegations of racial harassment by fellow employees fall far short of meeting

that standard.

Garmon complains, *inter alia*, that Brennan and Butler refused to speak to him, but he acknowledges, without further explanation, that such lack of communication ended in 2008. Further, Garmon complains of not receiving individual praise during weekly safety meetings; he does not assert, however, that he was in any way criticized or humiliated in such meetings, nor is there any assertion of racial epithets or race-based comments. With respect to not being allowed to work with structural erection diagrams, Garmon concedes that he did not ask to work with those diagrams and he acknowledges, albeit reluctantly, that he did receive training on the diagrams.

None of those alleged events, which also fall outside of the limitations period of § 1981 claims, contain any allegations of race-based harassment. Although Garmon takes the opportunity to point to alleged wrongdoings by other employees, he makes no assertion that he engaged in similar conduct but that, unlike his Caucasian colleagues, he was disciplined for it. Garmon's claim that Brennan opposed Barack Obama's candidacy for President includes no allegation that Brennan's alleged opposition was based on race.

Garmon's allegations regarding two traffic related incidents, involving two Amtrak employees who do not work with Garmon, also fail to support any racial harassment claims. Garmon himself,

without further evidentiary support, simply attributes those incidents to his having filed this case because they happened after commencement of the litigation; he makes no allegations that the incidents were race-related. In sum, Garmon has not even suggested a race-based connection to any of the conduct he considers discriminatory. In the absence of any evidence that would indicate a discriminatory *animus*, the Court finds that Garmon has not met his burden to establish a *prima facie* case for a hostile work environment case. Accordingly, Amtrak's motion for summary judgment is GRANTED with respect that claim as well.

## Conclusion

The Court finds that Garmon has failed to make a *prima facie* showing of a race-based adverse employment action or a hostile work environment claim. Amtrak's motion for summary judgment is GRANTED. The Clerk is directed to enter judgment for the Defendant.


SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi
United States District Judge

June 22, 2015